No. 24-1598

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————————

STEVEN BERNITZ, *Plaintiff-Appellant*,

v.

USABLE LIFE; FULLSCOPE RMS, f/k/a Disability RMS, *Defendants-Appellees*,

SYNTA PHARMACEUTICALS GROUP LONG TERM DISABILITY
BENEFITS PLAN, *Defendant*.

———————————————————

# BRIEF FOR DEFENDANTS-APPELLEES USABLE LIFE AND
# FULLSCOPE RMS, f/k/a DISABILITY RMS

———————————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————————

Byrne J. Decker (1st Cir. #39530)
(byrne.decker@ogletree.com)
Scott K. Pomeroy (1st Cir. #85003)
(scott.pomeroy@ogletree.com)
Ogletree, Deakins, Nash, Smoak &
Stewart, P.C.
2 Monument Square, 7th Floor
Portland, ME 04101
(207) 387-2963

*Counsel for Defendant-Appellees
USAble Life; and Fullscope RMS,
f/k/a Disability RMS*

STEVEN BERNITZ v. USABLE LIFE, *et al.*,
No. 24-1598

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees make the following disclosures:

Defendant-Appellee USAble Life ("USAble Life") is a privately held company. Its direct corporate parent is Life & Specialty Ventures LLC. No publicly held company owns ten percent (10%) or more of USAble Life's outstanding shares.

Defendant-Appellee Fullscope RMS, f/k/a Disability RMS ("Fullscope RMS"), is properly known as Disability Reinsurance Management Services, Inc. Fullscope RMS is a wholly owned, indirect subsidiary of Sun Life Financial Inc. ("SLF"). SLF is a Canadian corporation and a reporting company under the Securities Exchange Act of 1934, as amended, with common shares listed on the Toronto, New York, and Philippines stock exchanges. SLF is the only publicly-owned company that owns ten percent (10%) or more of Fullscope RMS's outstanding shares.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... C1 of 1

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES .............................................................. iv

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ........................................................... 1

I.     The Group Policy requires Plaintiff to prove continuing
       disability and confers discretion on USAble Life. .................... 1

II.    USAble Life fully and fairly reviewed the Plaintiff's LTD
       claim. ...................................................................................... 3

       A.     Plaintiff stopped work after six months and applied for
              disability on the basis of his chronic back condition. ..................... 3

       B.     USAble Life paid benefits for the next five years, but by
              December 2019, USAble Life determined, based on
              updated evidence, that Plaintiff was no longer disabled. ............... 5

       C.     After appealing USAble Life's determination, Plaintiff
              refused to appear for an in-person medical examination,
              but other independent, board-certified physicians
              nevertheless confirmed that Plaintiff was neither
              physically nor cognitively impaired from the demands of
              his occupation. ............................................................................ 15

       D.     More than a year after the start of the appeal, Plaintiff
              submitted additional advocacy, and USAble Life engaged
              yet another independent board-certified physician to
              review Plaintiff's belated submissions. ......................................... 22

E.      Following the commencement of suit, USAble Life
        agreed to a voluntary review to consider Plaintiff's
        additional rebuttals, but his new submissions did not
        prove disability or otherwise support a different
        conclusion. ................................................................... 27

III.    The District Court correctly applied ERISA's deferential
        standard of review and upheld USAble Life's determination. ................ 31

SUMMARY OF THE ARGUMENT ................................................. 34

ARGUMENT AND CITATIONS OF AUTHORITY ...................................... 35

I.      USAble Life's determination was correct, let alone reasonable,
        and easily survives the deferential "arbitrary and capricious"
        standard of review that applies here. ...................................... 35

        A.      Contrary to Plaintiff's assertion, USAble Life properly
                considered and applied the Group Policy's definition of
                disability. ......................................................... 36

        B.      Though it was not USAble Life's burden to prove
                Plaintiff's ability to work, substantial record evidence
                confirms that Plaintiff's physical impairments
                sufficiently improved by January 2020 to allow him to
                perform the sitting, standing, and travel requirements of
                his occupation. ..................................................... 38

        C.      USAble Life correctly rejected Plaintiff's attempt, on
                appeal, to shift the basis of his claim to newly-alleged
                cognitive symptoms because Plaintiff had previously
                denied such symptoms, and the medical evidence he
                belatedly offered did not support disability on such
                grounds at any time. ................................................ 40

        D.      USAble Life properly considered all of Plaintiff's alleged
                impairments in light of the physical and non-physical
                requirements of his occupation. ..................................... 47

E.  The 2018 ERISA regulations are inapplicable because they post-date Plaintiff's claim, but even if they did apply here, USAble Life complied with them by fully explaining the basis of its decision.. ............................................... 51

F.  Plaintiff cannot meet his burden to show "arbitrary and capricious" decision-making by picking at the evidence. ............. 54

II.  The deferential "arbitrary and capricious" standard of review is not altered by an administrator's so-called structural conflict, and in any event, Plaintiff has made no showing that bias or conflict played any role in USAble Life's determination. ...................... 56

CONCLUSION .................................................................................. 58

CERTIFICATE OF COMPLIANCE ................................................. 59

CERTIFICATE OF SERVICE ........................................................... 60

# TABLE OF AUTHORITIES

## Cases

Abromitis v. Continental Casualty Co., 261 F. Supp. 2d 388, 391
(W.D.N.C. 2003). ........................................................... 45

Ampe v. Prudential Ins. Co., 2018 WL 5045184 (D. Mass. Oct. 17,
2018). ........................................................................ 22

Arruda v. Zurich America Ins. Co., 951 F.3d 12, 21 (1st Cir. 2020). ................. 1

Bard v. Boston Shipping Ass'n, 471 F.3d 229, 242 n.17 (1st Cir.
2006). ....................................................................... 39

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). ....................... 32

Conkright v. Frommert, 559 U.S. 506, 520 (2010). .......................... 36

Cusson v. Liberty Life Assurance Co., 592 F.3d 215, 229 (1st Cir.
2010). ....................................................................... 40

D&H Therapy Assocs., LLC v. Boston Mutual Life Ins. Co., 640 F.3d
27, 37 (1st Cir. 2011). .................................................. 56

Denmark v. Liberty Life Assurance Co., 566 F.3d 1 (2009). ..................... 31, 57

Dunham-Zemberi v. Lincoln Life Assurance Co., 629 F. Supp. 3d
1220, 1232–33 (S.D. Fla. 2022). ................................ 46

Dutkewych v. Standard Ins. Co., 781 F.3d 623, 633 (1st Cir. 2015). .............. 34

Ehlert v. Metropolitan Life Ins. Co., 2020 WL 6871021 (D. Mass.
Nov. 23, 2020). .......................................................... 22

Estrella v. Hartford Life & Accident Ins. Co., 2011 WL 4007679 at *4
(D. Mass. Sept. 6, 2011). ............................................. 58

Evans v. Eaton Corp. LTD Plan, 514 F.3d 315, 321–22 (4th Cir.
2008). ....................................................................... 56

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). ...................... 1, 34

Gorbacheva v. Abbott Labs. Ext. Disability Plan, 309 F. Supp. 3d 756,
    771 (N.D. Cal. 2018), *aff'd*, 794 F. App'x 590 (9th Cir. 2019). ................. 46

Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108
    (2013). ...................................................................................... 36

Hocheiser v. Liberty Mutual Ins. Co., 2021 WL 672660 at *10 (D.N.J.
    Feb. 22, 2021), *aff'd*, 2023 WL 1267070 (3d Cir. Jan. 31, 2023). .............. 46

Lake v. Hartford Life & Acc. Ins. Co., 320 F. Supp. 2d 1240, 1249
    (M.D. Fla. 2004), *aff'd*, 126 F. App'x 463 (11th Cir. 2004). ...................... 46

Lavery v. Restoration Hardware LTD Benefits Plan, 937 F.3d 71, 82
    (1st Cir. 2019). .......................................................................... 53, 58

Leahy v. Raytheon Co., 315 F.3d 11, 19 (1st Cir. 2002). ........................... 35, 55

Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005). ....................... 34

McDonough v. Aetna Life Ins. Co., 783 F.3d 374 (1st Cir. 2015). ............. 33, 47

Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). ................... 31, 34, 57

Morales-Alejandro v. Medical Card Sys., Inc., 486 F.3d 693, 698 (1st
    Cir. 2007). ................................................................................... 34

Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1270–75
    (10th Cir. 2002). .......................................................................... 43

Niebauer v. Crane & Co., 783 F.3d 914, 927 (1st Cir. 2015). .................... 52, 53

O'Connell v. Hartford Life & Accident Ins. Co., 2023 WL 2633789
    (D. Mass. March 24, 2023). .......................................................... 22

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510 (1st Cir. 2005). ............... 33

Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014). ................................................................................ 35, 36

Ovist v. Unum Life Ins. Co., 2020 WL 1931755 at *8 (D. Mass. Feb. 21, 2020), *report and recom'n adopted*, 2020 WL 1931958 (D. Mass. Mar. 27, 2020), *aff'd*, 14 F.4th 106 (1st Cir. 2021). ......................... 58

Ovist v. Unum Life Ins. Co., 14 F.4th 106, 121–22 (1st Cir. 2021). ........... 43, 47

Sobh v. Hartford Life & Accident Ins. Co., 658 Fed. App'x 459, 466 (11th Cir. 2016). ................................................................................ 43

Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69, 77 (1st Cir. 2006). ................................................................................ 35, 40, 55

## Statutes and Regulations

28 U.S.C. § 1291. ................................................................................ 1

28 U.S.C. § 1331. ................................................................................ 1

28 U.S.C. § 1332. ................................................................................ 1

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* ................................................................ *passim*

29 U.S.C. § 1102. ................................................................................ 36

29 U.S.C. § 1132. ................................................................................ 1

29 C.F.R. § 2560.503-1. ..................................................................... 51, 52

82 Fed. Reg. 56,560-1 (Nov. 29, 2017). ............................................ 52

81 Fed. Reg. 92,316-1 (Dec. 19, 2016). ............................................ 52

## STATEMENT OF JURISDICTION

This case arises under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq*. ("ERISA"). Jurisdiction was proper in the United States District Court for the District of Massachusetts under 28 U.S.C. §§ 1331 and 1332 and 29 U.S.C. § 1132(e). Jurisdiction in this Court is proper under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Although Plaintiff lists at least three alleged shortcomings of the District Court's decision as purported "issues" for appeal, under the applicable standard of review in this ERISA benefits case, the only real issue for review by this Court is whether USAble Life's final determination was "arbitrary and capricious" or otherwise unsupported by "substantial evidence." *See*, *e.g*., Arruda v. Zurich America Ins. Co., 951 F.3d 12, 21 (1st Cir. 2020) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), among other authorities).

## STATEMENT OF THE CASE

**I.  The Group Policy requires Plaintiff to prove continuing disability and confers discretion on USAble Life.**

To be eligible for LTD benefits under the Group Policy, claimants at all times bear the burden to prove that they remain continuously disabled. *See*

AR7540–41; AR7553–54.[1]  Even after benefits are initially approved, claimants

must regularly provide "proof of continued disability" to maintain benefits.

AR7540; AR7541.  Failure to provide such proof is grounds for termination.

AR7541 ("If you do not provide us with continuing proof of disability and the

items and authorization necessary to allow us to determine our liability, we will not

pay benefits."); *see also*, *e.g.*, AR7553–54 (explaining that benefits terminate on

the earlier of "the date you are no longer disabled as defined" or "the date you fail

to furnish Proof of Loss").

    The Group Policy provides that "Disability" means "[a]n injury, sickness, or

pregnancy . . . [that] prevents you from performing at least one of the material

duties of your regular occupation with reasonable accommodations."  AR7532.  "If

you can perform the material duties of your regular occupation with reasonable

accommodation(s), you will not be considered disabled."  AR7532.  "Material

Duties" means "the sets of tasks or skills required generally by employers from

those engaged in an occupation."  AR7533.  A claimant's "Regular Occupation" is

---

[1] The Administrative Record consists of two parts.  The first 7,563 pages of the record, which reflect administration of Plaintiff's LTD claim before he filed suit, are cited in this Brief as AR1 through AR7563 and can be found in Volumes III through XV of the Joint Appendix.  USAble Life compiled the balance of the record during a voluntary review that followed the commencement of suit.  The post-litigation part of the record is separately numbered and cited herein as PL1 through PL546.  Those pages can be found in Volume II of the Joint Appendix.

defined as "the occupation in which you were working immediately prior to becoming disabled." AR7535.

As also relevant here, even if a claimant is receiving benefits, coverage under the Group Policy ends once a claimant "is no longer in an eligible class" or "stops active work." AR7539. Accordingly, the Group Policy does not cover new disabilities that might arise after the claimant's coverage ends.

Finally, the Group Policy contains a broad grant of discretionary authority: "The policyholder delegates to [USAble Life] and agrees that [it has] have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy." AR7540.

## II.     USAble Life fully and fairly reviewed the Plaintiff's LTD claim.

### A.     Plaintiff stopped work after six months and applied for disability on the basis of his chronic back condition.

Plaintiff stopped working for Synta Pharmaceuticals ("Synta") on June 18, 2014, allegedly due to a worsening of his long-standing back condition. In applying for LTD benefits, Plaintiff described his occupation as requiring "desk work, frequent meetings, travel, [and] conferences." AR7505. He claimed his back pain was most severe when required to sit for more than "2–3 hours per day." AR7505. In connection with the claim, Plaintiff submitted an Attending Physician's Statement by Dr. Omar El-Abd (pain management) who noted Plaintiff's self-reported pain symptoms and described Plaintiff's physical condition

as a "Class 5" impairment, meaning that he considered Plaintiff incapable of even sedentary-level activity.  AR7506.

Because the claim for benefits came within the first 12 months of his employment with Synta, Senior Disability Analyst Anna Delaney advised Plaintiff on September 9, 2014 that a pre-existing condition exclusion ("pre-ex") review was necessary.  AR7495.  On November 26, 2014, Attorney Mala Rafik gave notice that she represented Plaintiff.  AR7441.

On February 11, 2015, Nurse Kristin Fielding reviewed Plaintiff's medical treatment during the look-back period, *see* AR7058, and thereafter sent written questions to treating physicians Dr. El-Abd and Dr. Guy Pugh (internal medicine) to clarify the purpose of gabapentin prescriptions they wrote.  *See* AR7035; AR7033.  Relying on Dr. Pugh's representation that gabapentin was not prescribed for back pain, Nurse Fielding prepared an addendum on February 26, 2015, finding that the pre-ex exclusion did not apply.  AR7030.

Based on Nurse Fielding's review, Ms. Delaney wrote on March 17, 2015, to approve LTD benefits.  AR6980.

**B.    USAble Life paid benefits for the next five years, but by December 2019, USAble Life determined, based on updated evidence, that Plaintiff was no longer disabled.**

Over the next five years, USAble Life periodically reviewed the claim, requested additional information, and conducted surveillance.  Notable items in the record during this period include the following:

**May 19, 2015.**  Vocational consultant Teresa Marques prepared an Own Occupation Assessment.  AR5304.  As Ms. Marques explained, Plaintiff's job with Synta was a leadership position responsible for directing "business development activities," overseeing all corporate communications, and developing a team of employees to support such work.  AR5304–05.  Notably, the Synta job description does not identify any specific travel requirements.  *See* AR7409.  Nevertheless, Ms. Marques determined that Plaintiff's job at Synta corresponded to the occupation of "Marketing Manager," one which often requires travel.  Citing a Department of Labor survey which found that some 39% of marketing managers reported driving "weekly or monthly," AR5305–06, Ms. Marques concluded, "While a majority of tasks are performed at the sedentary physical demand level,

due to the periods of frequent traveling with specific timelines/deadlines, Marketing Manager is performed at the light physical demand level." AR5306.[2]

**October 5, 2015.** Plaintiff moved from Boston, Massachusetts to Encinitas, California. AR6846.

**November 14, 2016.** Medical Review by Nurse Kristin Fielding. AR6226. Nurse Fielding observed that Plaintiff's most recent back surgery in April 2016 was his sixth lumbar spine surgery since 1999. Nurse Fielding accepted the opinion of treating physician Dr. Yogesh Patel (pain management) that, following the surgery, Plaintiff would only be able to sit for 1–2 hours a day and could stand for no more than 15–30 minutes per day due to pain. *See also*, *e.g.*, AR6389.

**October 4, 2017.** Medical Review by Dr. Stewart Russell, an independent physician board-certified in occupational medicine. AR5949. Following a review of Plaintiff's updated medical records, Dr. Russell wrote, "the insured is presently impaired from performing full-time light or sedentary occupations, secondary to his multiple subsequent back surgeries and their poor result[s]." AR5959. "In my opinion, the impairment will be lifelong." AR5959. Though it was not a question

---

[2] On page 10 of his Brief, Plaintiff criticizes Ms. Marques for not referencing the "exquisite concentration" he claims his marketing occupation requires. But the quoted language—purportedly ignored by Ms. Marques—actually comes from an opinion first expressed by Michael LaRaia, an advocate engaged by Plaintiff's counsel, some six-and-a-half years after Ms. Marques prepared her report. *See* AR649. The phrase appears nowhere in the Synta job description. *See* AR7490.

that Dr. Russell was asked to examine, Dr. Russell also disagreed with Nurse Fielding's pre-ex review because contrary to Dr. Pugh's representations, the records showed that Plaintiff was likely taking gabapentin during the look-back period to treat his back condition.  AR5959.

**January 17, 2018.**  Plaintiff visited Dr. Biraj Shah (primary care) to receive travel vaccinations related to Plaintiff's upcoming "10 day holiday" in Baja, Mexico.  AR5134.

**August 1, 2018.**  A Social Security Administrative Law Judge ("ALJ") issued a decision denying Plaintiff Social Security Disability Insurance ("SSDI") benefits.  AR5463.  According to the ALJ, Plaintiff had the capacity to perform sedentary work, with certain additional limitations for occasional stooping, kneeling, crouching, or crawling, but could not work at unprotected heights and "must be afforded leeway to shift positions between sitting and standing as needed every 60 to 90 minutes to alleviate discomfort while remaining on task."  AR5473. While the physician testimony was "generally consistent in that they all assess the claimant is able to perform a range of work at the light exertional level with some differences in the degree of specific function-by-function limitations," the ALJ nevertheless "assessed a slightly more conservative sedentary residual functional capacity."  AR5476.

The ALJ made no finding that Plaintiff was impaired from frequent or occasional travel. Rather, the ALJ found the alleged severity of Plaintiff's symptoms was inconsistent with Plaintiff's demonstrated ability to travel:

> [T]he claimant reported activities including taking college classes, driving, taking walks up to half a mile, cooking, taking out the trash, and caring for a dog. He indicated that he exercised regularly with a personal trainer and that he is able to have meals in restaurants, read, and watch television, perform all personal care, perform light housework, and participate on charitable boards. He described trips to Hawaii and National Parks in the southwest, and spent about a month in San Diego house-hunting after he stopped working after a long career in the Boston area.

AR5474. Based on such findings, and a vocational consultant's testimony that Plaintiff's prior work included the "sedentary" occupations of "Vice President" and "Program Manager," the ALJ specifically found Plaintiff "capable of performing past relevant work." AR5478.[3]

---

[3] On page 58 of his Brief, Plaintiff argues that the ALJ concluded that Plaintiff "did not have the ability to perform an occupation at a physical demand level higher than a limited sedentary occupation." Plaintiff has turned the ALJ's reasoning on its head. As the ALJ denied benefits, rather than granting them, his decision describes the minimum extent of Plaintiff's functional capacity, not its maximum. Moreover, the limitations the ALJ actually endorsed—such as occasional crouching and leeway to adjust position—would not impair Plaintiff's ability to perform his own occupation, regardless of how that occupation's physical demand level might be characterized. *Compare, e.g.*, AR5473 (ALJ's description of Plaintiff's residual capacity) *with* AR4705 (Ms. Marques's description of the physical requirements for the occupation of "Marketing Manager.").

**August 28, 2018.**  Plaintiff consulted Dr. Ken Fujioka (endocrinology) for assistance with his ongoing weight loss program.  AR5151.

**March 22, 2019.**  Plaintiff began visiting physical therapist Kaitlin Mikkelsen.  AR4949.  At these physical therapy sessions, which continued through the end of the year, Plaintiff exercised with a personal trainer as often as three times per week.[4]

**April 11, 2019.**  Plaintiff visited Dr. Patel, who wrote that Plaintiff's pain medications are "providing relief without uncontrolled side effects."  AR4982.  "The patient continues to report substantial relief and improved function with use of these medications."  AR4982.  Plaintiff "reports he has recently lost 70 pounds and some of this other health issues have resolved."  AR4983.  On physical examination, Dr. Patel wrote that Plaintiff's gait was "normal."  AR4984.[5]

---

[4] On page 18 of his Brief, Plaintiff contends that he had "more medical visits" in 2019 than in any previous year.  This is only true if one counts Plaintiff's physical therapy sessions.

[5] On page 17 of his Brief, Plaintiff directs the Court's attention to a "94-page summary" of Plaintiff's alleged "medication side-effects."  The document is actually a list of all prescriptions obtained from July 2012 through June 2019. While the document does exhaustively list the known possible side-effects of each of the medications, it does not contain a single word describing any instance of Plaintiff actually reporting, let alone experiencing, any such side-effects.  *See* AR5312–417.

**May 10, 2019.**  Ms. Mikkelsen's physical therapy notes state that Plaintiff reported his "low-back pain is gradually improving each treatment session." AR4945.

**June 11, 2019.**  Ms. Mikkelsen wrote, "Patient reports a significant decreas[e] in daily pain."  AR4940.  "Functional status had improved with physical therapy."  AR4942.

**June 28, 2019.**  Plaintiff visited Dr. Sanjum Samagh, an orthopedic surgeon, to report a new onset of left hip pain, ultimately attributable to a labial tear. AR4811.  On physical examination, Plaintiff presented as "healthy-appearing," and "NAD," meaning "not in acute distress."  AR4814.  Dr. Samagh observed that Plaintiff had "normal gait, no limp" and that he was "ambulating with no assistive devices."  AR4814.  With respect to Plaintiff's lumbar spine, Dr. Samagh wrote:

> Inspection: normal alignment.  Bony Palpation: no tenderness of the spinous process, the transverse process, the paraspinals, the sacrum or the coccyx.

> \* \* \*

> The thoracic and lumbar spine is normal in appearance.  No pain on palpation in the thoracic or lumbar spine area.  Range of [motion] is noted to be normal for age.

AR4814.

**July 2, 2019.**  Plaintiff visited Dr. Patel and again reported "substantial relief and improved function" with use of his pain medications and denied experiencing

unwanted side-effects like fatigue or cognitive impairment. AR4905. On examination, Dr, Patel noted Plaintiff's "normal" gait and that he showed "no signs of significant sedation." AR4906.

**July 11, 2019.** Ms. Mikkelsen wrote, "Patient feels significant reduction in pain after leaving physical therapy," and he "continues to notice gradual improvements in mobility and function." AR4935.

**July 15–19, 2019.** Investigators engaged by USAble Life observed Plaintiff being active over several days. "The subject was observed as he worked with a personal trainer on cardio utilizing a treadmill, free weights with barbells, pull downs and flys on a weight machine, as well as shoulder exercises utilizing bands and leg extensions on a weight machine." AR4965.

**August 7, 2019.** The Social Security Appeals Council upheld the ALJ's denial of Plaintiff's application for SSDI benefits. AR4920.

**September 3, 2019.** Plaintiff visited Dr. Patel. AR4899. Although Dr. Patel increased Plaintiff's pain medication at this visit, that increase was not due to increased reports of back pain, as Plaintiff misleadingly implies. *See*, *e.g.*, Appellant's Br. at 19. Rather, Dr. Patel increased the dosage "in order to provide . . . greater postop pain relief" in anticipation of Plaintiff's upcoming hip surgery. AR4899. Dr. Patel's physical examination was again unremarkable,

noting Plaintiffs' "normal" gait and "no tenderness to palpation" with respect to his back.  AR4900–01.

**September 9, 2019.**  Plaintiff visited Dr. Fujioka, who noted that Plaintiff was "doing well" and "maintaining an impressive weight loss."  AR4857.  Dr. Fujioka wrote that Plaintiff is "working with a personal trainer 3 days a week."  On a review of systems, Dr. Fujioka wrote that Plaintiff was "[n]egative for fatigue," "[n]egative for arthralgias and back pain," and "[n]egative for behavioral problems, decreased concentration, dysphoric mood and sleep disturbance." AR4857.

**September 10, 2019.**  Plaintiff had hip surgery and recovered without complications.  *See*, *e.g.*, AR4784–85.

**October 3, 2019.**  Plaintiff completed an Activities of Daily Living Questionnaire.  AR4756.  Plaintiff reported that he was "unable to sit for more than 1–2 hours or stand for more than 30 minutes."  AR4756.  He also claimed that his pain medications "make concentration difficult."  AR4756.  However, he acknowledged volunteer work on the boards of various charitable organizations, travel to Florida to visit family, and travel to Michigan to visit friends.  AR4760. He also acknowledged going on an African safari earlier in the year.  About that

trip he said, "Surprisingly the bumpiness of the safari vehicles seemed to help my back somewhat, certainly more so than just sitting for hours each day." AR4762.[6]

**October 28, 2019.** Addendum Medical Review by Dr. Russell. AR4740. After a thorough review and summary of updated medical evidence and surveillance, Dr. Russell concluded that Plaintiff's condition had improved since the time of his last review. Notably, as Dr. Russell explained, Plaintiff "lost about 70 pounds, thereby decreasing the load on his low back." AR4745. Dr. Russell also observed that Plaintiff was exercising with a personal trainer three times per week, playing "pickle-ball" on other days,[7] regularly traveling, including a two-week African safari, and continuing his volunteer activities on charitable boards. AR4745–46. Dr. Russell also concluded that surveillance reports showing Plaintiff's ability to drive were inconsistent with Plaintiff's claim of cognitive

---

[6] Contrary to the assertion on page 21 of his Brief, Plaintiff did not "proactively" disclose his Africa trip. Rather, he disclosed it only after the fact, and only in response to USAble Life's specific inquiry about international travel. *See*, *e.g.*, AR4760.

[7] Throughout his Brief, Plaintiff asserts that all references to "pickle-ball" were made in error. *See*, *e.g.*, Appellant's Br. at 23, 26, 61. This is not so. Dr. Fujioka repeatedly documented Plaintiff's self-report that he was working with a personal trainer three days a week and "playing pickle ball on his off days." *See* AR5208; AR5228; AR5277. But following USAble Life's initial decision to terminate benefits, Dr. Fujioka later changed position, disclaimed the accuracy of his own contemporaneous treatment notes, and tried to minimize evidence of Plaintiff's physical activity by saying that Plaintiff "apparently just took a few lessons and then attempted to play but was unable." *See* AR 3065.

impairment. AR4746. Viewing all of the most up-to-date evidence, Dr. Russell concluded that Plaintiff was no longer physically impaired from performing his former work at Synta, which, based on Ms. Marques's earlier assessment, Dr. Russel still described as a "light physical demand occupation." AR4740; AR4746.

**November 6, 2019.** Ms. Marques prepared an Addendum Own Occupation Assessment to re-evaluate her prior occupational assessment in light of the intervening ALJ decision. AR4703. Commenting on the ALJ's use of "Vice President" and "Program Director" to describe Plaintiff's prior work, Ms. Marques said that those are "generalized occupations . . . focused on overall organizational/department management." AR4704. Relying again on the employer's job description, Ms. Marques maintained that Plaintiff's occupation was more specific to corporate communications, and she again opined that "Marketing Manager" was therefore the appropriate occupational title, AR4704, and that the occupation, as it exists in the national economy, is performed "primarily sitting," affords "standing position changes as needed," and requires only "occasional standing, walking, [and] traveling." AR4705.

**December 2, 2019.** Addendum Medical Review by Dr. Russell. AR3782. After review of updated medical records, including those relating to Plaintiff's September 2019 hip surgery, Dr. Russell concluded that Plaintiff might be temporarily impaired for three weeks while recovering from his hip surgery, but

the most recent records did not otherwise support ongoing restrictions or limitations, due to his back condition, that would preclude light physical demand level work.

On **December 12, 2019**, Senior Case Manager Bryan Emma wrote to terminate LTD benefits after paying the full December 2019 benefit under a reservation of rights. AR3753; AR3757. In his thorough and detailed termination letter, Mr. Emma quoted the relevant Group Policy language, including its requirement that Plaintiff prove a disability that prevents performance of "at least one of the material duties of your regular occupation with reasonable accommodations." AR3753. Mr. Emma also discussed all of the evidence that had come to USAble Life's attention since its initial approval of the claim, including Dr. Russell's reviews, the ALJ determination, Plaintiff's weight loss, his extensive travel to Mexico, Africa, and elsewhere, and much else. *See* AR3753–58.

### C. After appealing USAble Life's determination, Plaintiff refused to appear for an in-person medical examination, but other independent, board-certified physicians nevertheless confirmed that Plaintiff was neither physically nor cognitively impaired from the demands of his occupation.

With the assistance of his legal counsel, Plaintiff appealed USAble Life's determination on May 21, 2020. AR3028. In connection with the appeal, Plaintiff submitted advocacy letters from Dr. Fujioka and Dr. Michael White (acupuncture)

15

which echoed Plaintiff's subjective complaints.  *See* AR3065; AR3062.  He also

submitted personal statements from himself and his wife.  *See* AR3075; AR3085.

And Plaintiff also submitted a so-called Functional Capacity Evaluation ("FCE")

report by non-physician Barbara Tourtellott, dated March 18, 2020, which was also

based largely on Plaintiff's subjective self-report.  *See* AR2800.  All of these

materials emphasized Plaintiff's self-reported back pain symptoms and tried, in

various ways, to explain away the extensive evidence of Plaintiff's travel and

regular exercise, for example, by saying that Plaintiff ultimately found "pickle

ball" to be too strenuous and that he had to stop playing.  *See*, *e.g*., AR3065;

AR3075.  In his personal statement, Plaintiff also said that he had to modify some

travel plans to lessen his pain, for example, by "only fly[ing] first or business class

on flights over 2 hours."  AR3075.

    USAble Life assigned the appeal to Senior Appeals Consultant Sandra

Kaserman.  AR3027.  Upon receipt of the materials, Ms. Kaserman allowed

Plaintiff's requests for additional time, *see*, *e.g*., AR2944; AR2919, sent notice of

an extension of time for the appeal, *see* AR2870, and obtained a medical review

from Dr. Richard Maguire, who is board certified in occupational medicine.  *See*

AR2630–55.

In his report, dated October 2, 2020, Dr. Maguire provided a detailed

summary of the evidence, and he also noted various "inconsistencies" within Ms.

Tourtellott's report. AR2649. As he explained,

> The FCE provider [did] not measure and record physiological
> responses to [Plaintiff's] activity level or pain such as increased
> heart rate or respiratory rate. There [was] no documentation of
> Waddell signs being assessed looking for nonorganic findings. . . .
> The [Plaintiff's] aerobic capacity is not measured using a sub
> maximal treadmill test. Video analysis did show that the [Plaintiff]
> had the ability to use a treadmill.

AR2649. However, given conflicting information in the record and Plaintiff's

"most recent surgeries," Dr. Maguire recommended that USAble Life request an

in-person medical examination ("IME") to confirm Plaintiff's functional capacity.

AR2649. Like Dr. Russell before him, Dr. Maguire also found that Plaintiff had

received treatment for his back condition during the look-back period. AR2654.[8]

In light of Dr. Maguire's IME recommendation, Ms. Kaserman wrote to

Plaintiff's counsel on October 12, 2020, to say that USAble Life would pay back

benefits from January 2020 through October 2020 under a reservation of rights.

_____

[8] As in the District Court, Plaintiff expends much energy arguing that USAble Life
"waived" the Group Policy's pre-ex exclusion by failing to more quickly discover
the truth about Plaintiff's gabapentin use during the applicable look-back period.
*See*, *e.g.*, Appellant's Br. at 27; Pl.'s Opp. to Sum. J. at 22–23 (ECF Doc. #82). To
be clear, however, USAble Life never cited the Group Policy's pre-ex exclusion as
its reason for terminating benefits. Accordingly, Plaintiff's waiver arguments are
moot.

AR2599.  Ms. Kaserman also wrote to request that Plaintiff appear for an IME, AR2573, but he refused, purportedly due to his concerns about "COVID and the rates of positive cases and deaths climbing at this time."  *See*, *e.g*., AR2567.[9]  So instead, Ms. Kaserman opted to collect updated medical records and ask a third-party provider to select an independent physician to review them.

The vendor selected Dr. Richard Kaplan, who is board-certified in pain medicine, and he prepared a report on December 23, 2020.  *See* AR2534–48.  Dr. Kaplan concluded that the updated medical evidence, surveillance, and other evidence in the file did not support impairment from Plaintiff's occupational duties, as described in the vocational materials reviewed, for the period from January 1, 2020 to the date of his report.  As he wrote, "There are numerous inconsistencies in the medical records as well as in the [Plaintiff's] statements which support that not only is impairment unsupported but rather that the claimant is both capable of an increased level of activity and that such an increased level of activity would likely be therapeutic in nature."  AR2534.  As Dr. Kaplan observed,

---

[9] Although such non-cooperation alone would have been sufficient grounds to terminate benefits, *see*, *e.g*., AR7541, USAble Life did not terminate on this basis. As in the District Court, Plaintiff quibbles over the meaning of the term "refused," *see*, *e.g*., Appellant's Br. at 28, but the record is clear that Plaintiff refused to appear. *See*, *e.g*., AR2573; AR2569; AR2567; AR2565.

Plaintiff's "ability to travel internationally, including in particular on a safari to Africa, are entirely inconsistent" with his claimed limitations. AR2541.

Moreover, Dr. Kaplan explained that Ms. Tourtellott's opinion relied on Plaintiff's subjective self-report and her conclusions were inconsistent with Plaintiff's weight loss, exercise program, and extensive domestic and international travel:

> [I]t is not clear that the techniques used in the [FCE] are valid to distinguish between physical requirements lower than that of a medium physical demand level. The [FCE] largely relies upon [Plaintiff's] subjective reports of pain without clear correlation to a diagnosis causing such a restriction. Moreover, a [FCE] at best can be only a snapshot in time. A [FCE] seems to make the assumption that whatever the claimant's abilities were on that day would reflect his abilities at other times. In fact, the overall medical record suggests just the opposite. Not only is an increase in activity likely to increase [Plaintiff's] overall physical ability into the future, but the overall history of his weight loss and exercise program, and subsequent domestic and international travel are all consistent with that expectation. Overall, it is clear that the more active this claimant becomes, the more his physical abilities continue to increase.

AR2540. Indicative of the thoroughness of his review, Dr. Kaplan also considered, for example, the potential side-effects of Plaintiff's pain medication. As he wrote,

> I would offer the opinion that since the medical records indicate that [Plaintiff] retains a driver's license and continues to drive a car, it does not appear that he has significant safety related cognitive deficits from his opioid use and there is no mental status examination or any other objective basis in the medical record to establish there are any cognitive limitations related to the [Plaintiff's] medical condition or otherwise.

AR2542.

On December 30, 2020, Dr. Maguire also prepared a supplemental report, in which he again reviewed the medical evidence in light of Plaintiff's occupational requirements, before concurring with Dr. Kaplan. AR2526.

After Ms. Kaserman shared Dr. Kaplan's and Dr. Maguire's new reports with Plaintiff, to provide an opportunity for him to respond, Attorney Rafik sought an extension of time. *See*, *e.g*., AR2516. Although Plaintiff had consistently denied cognitive symptoms prior to receipt of Dr. Kaplan's report, *see* AR5152 ("Negative for . . . decreased concentration"); AR5182; AR5208; AR5228; AR5277; AR5299; AR4857; AR557, and even on occasions thereafter, *see* AR566; AR563; AR560; AR557; AR554, Attorney Rafik wrote on March 19, 2021, that Plaintiff had been now referred for neuropsychological testing "which is in the process of being scheduled," and she requested that USAble Life refrain from making any final determination until the results of that testing were known. AR2440.

Based on additional medical records Plaintiff thereafter submitted, Dr. Maguire prepared a second addendum on March 24, 2021, *see* AR2436–37, and Dr. Kaplan prepared his first addendum dated June 30, 2021. *See* AR2159–66. Among other points, Dr. Kaplan observed, "[t]he recent medical records confirm that [Plaintiff] had a normal response to a screening test known as the Montreal

Cognitive Assessment Test." AR2161. Neither consulting doctor changed his prior view.

On May 18, 2021, Attorney Rafik told USAble Life that Plaintiff's further cognitive testing was postponed due to the need for another round of back surgery and Plaintiff's submission of additional medical records would be delayed because of a "cyberattack" that apparently occurred at Scripps Hospital. *See*, *e.g.*, AR2179.

When Ms. Kaserman sent copies of the addendum reports on July 2, 2021, *see* AR2155, Attorney Rafik responded with requests for additional information from USAble Life and again requested additional time to respond. *See*, *e.g.*, AR2128; AR2123; AR2118. On August 14, 2021, Attorney Rafik wrote again to request that USAble Life await the results of Plaintiff's long-delayed neuropsychological testing before rendering a final decision. AR895.

Dr. Kaplan prepared a second addendum on August 30, 2021 and a third addendum on September 13, 2021, each after USAble Life's receipt of additional medical records concerning Plaintiff's June 2021 fusion surgery. *See* AR888–90; AR870–71. Dr. Kaplan's opinion remained unchanged, but he recommended further review once the records pertaining to Plaintiff's post-operative rehabilitation and planned neuropsychological evaluation became available.

**D.** **More than a year after the start of the appeal, Plaintiff submitted additional advocacy, and USAble Life engaged yet another independent board-certified physician to review Plaintiff's belated submissions.**

On October 10, 2021, Plaintiff, through his counsel, submitted additional advocacy in the form of a Vocational Assessment Report by Michael LaRaia, dated September 9, 2021, *see* AR649–55, and a Neuropsychological Evaluation report by Dr. Kaaren Bekken, dated September 9, 2021. AR716. Both Mr. LaRaia and Dr. Bekken are frequent consultants to the plaintiffs' bar.[10]

In his report, Mr. LaRaia, a non-physician, opined that Plaintiff "remains vocationally unemployable," AR654, attacked USAble Life's determination, *see*, *e.g.*, AR at 654 ("It is my ongoing vocational opinion that [USABle Life] erred in its evaluation of [Plaintiff's] employability."), and disagreed with Drs. Kaplan and Maguire regarding medical opinions that Mr. LaRaia is himself neither qualified to offer or to criticize. *See*, *e.g.*, AR654 (disagreeing with Drs. Kaplan and Maguire because "neither spoke to nor examined" Plaintiff).

---

[10] For example, Attorney Rafik previously used both Mr. LaRaia and Dr. Bekken in Ehlert v. Metropolitan Life Ins. Co., 2020 WL 6871021 (D. Mass. Nov. 23, 2020). She also used Mr. LaRaia in O'Connell v. Hartford Life & Accident Ins. Co., 2023 WL 2633789 (D. Mass. March 24, 2023), and Dr. Bekken in Ampe v. Prudential Ins. Co., 2018 WL 5045184 (D. Mass. Oct. 17, 2018). Both consultants also appear as plaintiffs' opinion witnesses in numerous other reported decisions.

But as reflected even in his selective, lay review of the medical records, Mr. LaRaia conceded that Plaintiff had only "recently" begun complaining of "memory issues" around the time Dr. Patel made a note in his records of "memory change" in "early 2021"—*i.e.*, following Dr. Kaplan's first report. AR650; *compare*, *e.g.*, AR1152 (Dr. Patel's May 20, 2021 treatment note listing "memory change" among Plaintiff's reasons for the visit, but also noting that Plaintiff reports "[n]o adverse side effects" of his pain medications).

Separately, in her report, Dr. Bekken all but acknowledged that neuropsychological testing was "recommended" because of Dr. Kaplan's review. AR718. Dr. Bekken's testing found that Plaintiff's scores ranged from "Very Superior," to "High Average," to "Average" on most tests, but citing a few outlier scores on certain memory tests, she nevertheless concluded that Plaintiff was completely "incapacitated from his own occupation." AR718–22. Dr. Bekken concluded that Plaintiff had suffered a "cognitive decline," but she premised that conclusion on her own speculative assumption of Plaintiff's "very high estimated premorbid ability." AR722. Dr. Bekken's estimate in this regard did not cite or rely on any prior test results showing an actual decline from Plaintiff's premorbid ability. AR722. Moreover, Dr. Bekken did not describe any particular etiology or mechanism that might have caused Plaintiff's alleged cognitive decline. Nor did

she reconcile her findings with Plaintiff's own prior denials of medication side-effects in the contemporaneous medical records. *See* AR722.[11]

Upon receiving Dr. Bekken's report, Ms. Kaserman asked a third-party vendor to select a qualified independent physician to review it. The vendor selected Dr. Malcom Spica, who is board-certified in neuropsychology, and he prepared a report on October 18, 2021. AR702. Dr. Spica specifically noted Plaintiff's occupation "as a Senior Vice President, Corporate Development for a pharmaceutical company." AR702. In his review, Dr. Spica considered Plaintiff's cognitive function in light of the occupational duties and requirements outlined in Ms. Marques's November 6, 2019 vocational assessment. AR702; *see also* AR4703–06. In Dr. Spica's opinion, Dr. Bekken "chose to interpret the claimant's average scores as representing impairment," but the test results did not support her opinion. AR703. "Despite Dr. Bekken's speculation that [Plaintiff] might have scored even higher during some previous point in his life, his current performance pattern does not reflect a debilitating neurocognitive impairment." AR704.

On February 3, 2022, Plaintiff sent an addendum FCE report by Ms. Tourtellott, dated January 21, 2022. AR477. Ms. Tourtellott again based her

___

[11] Notably, the alleged Covid concerns that prevented Plaintiff from appearing for an IME as USAble Life had requested, did not prevent him from later appearing in-person for Dr. Bekken's evaluation.

evaluation primarily upon Plaintiff's self-report. Contrary to what he regularly told his treating pain medicine doctors, Plaintiff told Ms. Tourtellott that he "experiences problems with concentration and memory as well as fatigue as a side effect of his medications." AR479. Without addressing Plaintiff's prior denials of such side-effects or attempting to reconcile other contrary evidence in the file, she concluded that Plaintiff was not able to sit for more than 38 consecutive minutes. AR487. As Ms. Tourtellott described the testing, "[Plaintiff] was noted to shift in his chair with increasing frequency as the testing progressed and he was noted to emit loud 'sighs' and breathe heavily as the sitting activity progressed." AR487.

After reviewing all of Plaintiff's updated submissions, Dr. Kaplan prepared a fourth addendum on February 11, 2022. AR473. His opinion was again unchanged. He did note, however, that Plaintiff's self-reported daily use of marijuana could explain his purported cognitive symptoms.

Ms. Kaserman sent Attorney Rafik copies of Dr. Kaplan's and Dr. Spica's new reports on February 14, 2022, and allowed Plaintiff twenty-one days to respond. AR469; AR460. On March 7, 2022, having received no response, Ms. Kaserman wrote that USAble Life would complete its review based on the contents of the claim file at that time. AR445. Later that same day, March 7, 2022,

Attorney Rafik sent a letter objecting that Plaintiff's time to respond had not yet expired. *See* PL540–43.[12]

Notwithstanding Attorney Rafik's objection, Ms. Kaserman issued a determination letter on March 9, 2022, upholding the prior determination. AR426–35. Her letter summarized the evidence in the claim file, the appeal's long procedural history, and the extensive evidence that Plaintiff's condition improved following his weight loss. In making the determination, Ms. Kaserman declined to consider the letter Attorney Rafik sent on March 7, 2022.

On March 9, 2022, Attorney Rafik submitted another letter responding to Drs. Kaplan and Spica. PL537. With that letter, Attorney Rafik submitted a two-page letter from Dr. Bekken, dated March 8, 2022, but that correspondence included no additional clinical observations or test results. PL538–39.

Thereafter, Plaintiff filed this lawsuit on May 10, 2022. *See* Compl. (ECF Doc. #1).

---

[12] Note that this letter and Attorney Rafik's subsequent submissions to USAble Life are contained in the post-litigation ("PL") portion of the Administrative Record, which can be found in Volume II of the Joint Appendix.

**E.** **Following the commencement of suit, USAble Life agreed to a voluntary review to consider Plaintiff's additional rebuttals, but his new submissions did not prove disability or otherwise support a different conclusion.**

In August 2022, following the commencement of suit, USAble Life agreed to undertake a voluntary review to consider the additional arguments and materials that Attorney Rafik submitted on March 7 and March 9, 2022.[13]

In the post-litigation review, Attorney Rafik re-submitted copies of her March 7 and March 9, 2022 letters. *See* PL540; PL537. Attorney Rafik also submitted an affidavit of Plaintiff, in which he described his use of opioids and marijuana gummies allegedly under medical supervision, PL544–45, as well as the March 8, 2022 letter from Dr. Bekken. PL538–39. In that letter, Dr. Bekken took issue, *inter alia*, with Dr. Kaplan's opinion that opioid and marijuana use (whether under medical supervision or not) rendered any results of Plaintiff's cognitive testing invalid for forensic purposes. *See* PL538.

Ms. Kaserman forwarded Plaintiff's new submissions to Drs. Kaplan and Spica. In Dr. Spica's addendum report, dated August 27, 2022, *see* PL527–29, he

---

[13] In his Brief, Plaintiff criticizes the scope of USAble Life's post-litigation voluntary review as being too narrowly focused on Plaintiff's psychological testing and failing to comprehensively re-examine the whole record for any evidence which might pertain to his physical condition. *See* Appellant's Br. at 35, 37. Plaintiff misunderstands the limited purpose of the voluntary review, which was specifically to consider Dr. Bekken's late-submitted arguments.

explained that Dr. Bekken yet again "attempted to justify" her prior conclusion that Plaintiff suffers from a neurocognitive disorder "despite the lack of evidence of persisting dysfunction." PL528. Dr. Spica's prior opinions remained unchanged, and he sent Dr. Bekken a letter containing specific written questions, including for example, why, in her testing, she chose not to include "more sensitive measures of effort." PL521.

In a separate addendum, dated September 6, 2022, Dr. Kaplan also said that his opinion was unchanged. He said, "Dr. Bekken's letter largely is unsubstantiated *ad hominem* criticism of my [prior] report." PL510. Dr. Kaplan also wrote directly to Dr. Bekken on September 6, 2022, to reiterate, "My prior opinions do indeed take into consideration the prescription nature of the [Plaintiff's] opioid and marijuana use and the cognitive effects on his job." PL514.[14]

---

[14] Prior to this letter, the referring vendor asked for, and Ms. Kaserman provided, a template letter for Dr. Kaplan to use in writing to Dr. Bekken. *See* PL530. Contrary to Plaintiff's assertion, the template did not direct Dr. Kaplan to a "predetermined . . . conclusion." <u>Appellant's Br.</u> at 36. Rather, the template merely indicated where Dr. Kaplan's letter should include a "summary" and "rationale" for the opinions he had previously expressed in no less than five earlier reports. *See* AR2534–44 (dated December 23, 2020); AR2159–62 (June 30, 2021); AR888–90 (August 30, 2021); AR870–71 (September 13, 2021); and AR473–75 (February 11, 2022). And in any event, Dr. Kaplan did not, in the end, even use the template in preparing his letter to Dr. Bekken.

Ms. Kaserman provided Attorney Rafik with copies of the addenda, and Dr. Bekken then responded with argumentative response letters. *See* PL496; PL449. She denied that Plaintiff's opioid use had any effect on his cognitive testing. *See* PL449.

Dr. Spica provided an addendum dated September 18, 2022, PL483–84, and Dr. Kaplan provided an addendum dated September 22, 2022. PL473–74. Both consulting physicians explained why they found Dr. Bekken's arguments unpersuasive. *See* PL483; PL474. Upon receipt of these reports, Attorney Rafik requested additional time to respond, PL455, and sent additional updated medical records. *See*, *e.g*., PL386.

Dr. Spica prepared another addendum on November 5, 2022, PL298–99, and Dr. Kaplan prepared another addendum on November 9, 2022. PL222–24. Again, both reviewers' opinions remained unchanged. As Dr. Spica explained:

> Although Dr. Bekken emphasizes [Plaintiff's] occasional low scores on her measures, those scores do not detract from his normal performances noted above. There are many reasons an examinee may provide a low score (including lapses in motivation/effort); however, there are not multiple reasons for a claimant to obtain [an] intact score.

PL299. On November 30, 2022, Dr. Bekken wrote yet another argumentative response (again, without additional clinical evidence) to both reviewers. PL148–49. They, in turn, responded with new reports dated December 10 and December 15, 2022. PL137–38; PL91–93; *see also* PL96–97. As Dr. Spica explained, "None

of the items submitted provided additional quantified neuropsychological evidence supporting neurocognitive or behavioral health impairment." PL137. Moreover, he reiterated, Plaintiff's cognitive performance upon testing was "well within normal limits" and thus "inconsistent with a debilitating neurocognitive disorder." PL138.

Dr. Bekken sent a final response to Dr. Kaplan on December 16, 2022, PL85, and Dr. Kaplan prepared his final addendum on January 5, 2023. PL74. Dr. Kaplan wrote:

> As I noted previously, the neuropsychological testing performed by Dr. Bekken was performed while the claimant had recently utilized both opioid medication and marijuana. As I noted in a prior addendum, the fact that these medications may have been prescribed legally and for medically necessary indications does not in any way negate the observation that valid neuropsychological testing cannot be obtained under the influence of these medications.

PL74.

On January 30 and 31, 2023, Attorney Rafik wrote to confirm that she would not be submitting additional materials. PL40; PL47.

Following an exchange of several additional emails, Ms. Kaserman issued a final uphold decision on February 28, 2023. PL11. The uphold letter contains a long recitation of the claim's procedural history and the evidence in the file. In it, Ms. Kaserman also discusses the new materials received during the post-litigation review and the several additional reviews by Drs. Kaplan and Spica. PL21. Ms.

Kaserman concluded that her determination of March 9, 2022, was correct and should remain unchanged: "As evident in the claim file, [Plaintiff] was not disabled from his own light occupation as of January 2020 based on improvement in his condition since 2018 that is noted in the records from his treating medical providers." PL23.

III.    **The District Court correctly applied ERISA's deferential standard of review and upheld USAble Life's determination.**

On dispositive motions, the District Court granted judgment in favor of USAble Life after finding that Plaintiff failed to meet his burden to show that USAble Life's final determination was arbitrary and capricious or otherwise unsupported by substantial evidence.

In applying the "arbitrary and capricious" standard of review, the District Court specifically identified steps USAble Life took to insulate its claims process from potential bias before concluding, based on the whole record, that the conflict factor should be afforded "little weight" in the case. Mem. & Order at 15 (ECF Doc. #90; Add. 16) (citing Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); Denmark v. Liberty Life Assurance Co., 566 F.3d 1 (2009); and other authorities). "Given the steps taken by USAble Life, and absent any meaningful showing of bias by [Plaintiff], the Court does not afford USAble Life's structural conflict significant weight in its review under the arbitrary and capricious standard." Id. at 15–16 (Add. 16–17).

In its analysis, the District Court specifically quoted the Group Policy provision that measures "disability" against a claimant's ability to perform "at least one of the duties of [his or her] regular occupation with reasonable accommodations." _Id._ at 2 (Add. 3) (quoting the Group Policy). The District Court also recited the long procedural history of the claim, as set forth in the Administrative Record, highlighting, where appropriate, the abundant medical evidence confirming Plaintiff's weight loss and improved medical condition; the exchange of views regarding Plaintiff's neuropsychological testing; Plaintiff's national and international travel, volunteer work, and other increased activities; the reports of investigators' surveillance; and other evidence of functional capacity. _Id._ at 2–13 (Add. 3–14).

Rejecting Plaintiff's various arguments, the District Court cited Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), for the proposition that USAble Life was not required to automatically accord "special weight" to the opinions of Plaintiff's physicians. Mem. & Order at 18 (Add. 19). "Thus," explained the District Court, "USAble Life's reliance upon the opinions of Dr. Russell . . . and other developments in the record, as opposed to the opinions of [Plaintiff's] treating physicians, was not arbitrary and capricious." _Id._ at 18 (App. 19). "Nor is it the case," the Court continued, "that USAble Life disregarded, or otherwise failed to engage with, these opinions." _Id._ at 18 (Add. 19). For

example, "USAble Life did not ignore Dr. Bekken's findings, but instead referred her report and numerous addendum reports to Dr. Kaplan and Dr. Spica for their consideration and response." _Id._ at 20 (Add. 21).

Citing McDonough v. Aetna Life Ins. Co., 783 F.3d 374 (1st Cir. 2015), the District Court next rejected Plaintiff's contentions regarding the alleged insufficiency of USAble Life's vocational assessment. Mem. & Order at 19, n.5 (Add. 20). Citing Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510 (1st Cir. 2005), the District Court also rejected Plaintiff's contention that USAble Life's already lengthy determination letters should have exhaustively detailed every last piece evidence contained in the 8,000 page record. Mem. & Order at 21, n.6 (Add. 22).

"At base," the District Court concluded, "USAble Life rooted its determination that [Plaintiff's] condition had improved in substantial evidence, including, _inter alia_, the ALJ's denial of [Plaintiff's] application for SSDI benefits (and the Social Security Appeals Council's affirmance of same), his significant weight loss and the medical benefits of same, his travel to domestic and international destinations, and the personal observations of investigators." _Id._ at 18–19 (Add. 19–20).

## SUMMARY OF THE ARGUMENT

To achieve ERISA's careful balance, Courts must respect the discretionary authority of claim administrators where, as here, such authority is expressly granted. *See*, *e.g*., Glenn, 554 U.S. at 111; Firestone, 489 U.S. at 109. Under this deferential standard, the Court must uphold USAble Life's determination unless it finds, based on the administrative record, that the determination was "arbitrary, capricious, or an abuse of discretion." Dutkewych v. Standard Ins. Co., 781 F.3d 623, 633 (1st Cir. 2015). Said another way, USAble Life's determination "must be upheld if there is any reasonable basis for it." Morales-Alejandro v. Medical Card Sys., Inc., 486 F.3d 693, 698 (1st Cir. 2007) (quoting Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005)).

Here, Plaintiff attempts to meet his burden by arguing the facts without regard to their proper chronological sequence, omitting highly-relevant details, and focusing instead on irrelevant events and statements shorn from their necessary context. Plaintiff also highlights a large number of treating providers, most of whom did not support restrictions and limitations, but he ultimately cannot reconcile his claim with the indisputable evidence of his increased activity after 2018. Plaintiff argues that USAble Life should have eschewed such evidence and instead blindly accepted the unsupported opinions of his treating physicians and hired consultants, some of whom first examined Plaintiff only long after his

benefits and coverage ended. But the Court must resist Plaintiff's invitation to re-weigh or re-balance the record. That kind of second-guessing is erroneous under discretionary review. *See*, *e.g.*, Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 28 (1st Cir. 2014); Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69, 77 (1st Cir. 2006); Leahy v. Raytheon Co., 315 F.3d 11, 19 (1st Cir. 2002).

Contrary to Plaintiff's assertions, USAble Life fully engaged with all of the evidence he offered; it fully explained the rationale for its decisions at each stage of the proceedings; and its final determination was correct. Unable to refute the substantial record evidence of his improved physical capacity—including his program of regular exercise, his national and international travel, his ability to take college level courses, and his work on charitable boards—Plaintiff attempted to shift the basis of his claim, on appeal, to alleged but unsupported cognitive symptoms that he had previously denied. USAble Life duly considered all of the Plaintiff's alleged impairments before ultimately concluding that the evidence in the record did not support disability on any basis after January 1, 2020.

## ARGUMENT AND CITATIONS OF AUTHORITY

I. **USAble Life's determination was correct, let alone reasonable, and easily survives the deferential "arbitrary and capricious" standard of review that applies here.**

The only question properly before the Court is whether USAble Life abused its discretion or acted in an arbitrary and capricious manner in determining that

Plaintiff failed to meet his burden to prove entitlement to plan benefits beyond January 1, 2020. Under deferential review, "so long as substantial evidence supports the plan administrator's decision, the decision is not rendered unreasonable by the mere existence of evidence to the contrary." Ortega-Candelaria, 755 F.3d at 20.

Here, Plaintiff simply did not meet his burden. Indeed, in light of his active lifestyle following his substantial weight loss, there is no way he could have. On the basis of all of the evidence before it, USAble Life could not have come to any other conclusion consistent with its duty to adhere to the terms of the Group Policy and apply the Group Policy's strict proof requirement as written. *See*, *e.g.*, Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) ("And once a plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'") (quoting 29 U.S.C. § 1102(a)(1)); Conkright v. Frommert, 559 U.S. 506, 520 (2010) (holding that ERISA administrators "have a duty to all beneficiaries to preserve limited plan assets").

**A.    Contrary to Plaintiff's assertion, USAble Life properly considered and applied the Group Policy's definition of disability.**

As an initial matter, the Court must reject Plaintiff's assertion that USAble Life and the District Court each ignored the Group Policy language which requires Plaintiff to establish that he is unable to perform "at least one of the material duties

of [his] regular occupation with reasonable accommodations." *See*, *e.g.*, Appellant's Br. at 8, 43, 49, 59; *see also*, AR7532. USAble Life's various determination letters and the District Court's decision all expressly quote the specific Group Policy language allegedly ignored. *See*, *e.g*, AR3753; AR426; PL12; Add. at 3. Throughout its administration of the claim, USAble Life was aware of and properly applied the "one duty" language.

Thus, USAble Life was not "blind to its own measuring stick," as Plaintiff contends. Appellant's Br. at 52. Rather, it is Plaintiff who, during the administration of his claim, shifted from an alleged physical impairment to alleged cognitive ones. And Plaintiff, even now, is coy about exactly which "one duty" he has allegedly been continuously unable to perform. On page 66 of his Brief, for example, Plaintiff variously identifies that "one duty" as "the ability to sustain full-time work, *or* to travel, *or* to engage in . . . high-level intellectual demands." Appellant's Br. at 66 (emphasis added). In any event, Plaintiff failed to prove that any of his alleged physical impairments continued to prevent him, after January 1, 2020, from performing any of the duties of his former occupation as a marketing executive or that any of his alleged cognitive impairments precluded such work at any time.

**B. Though it was not USAble Life's burden to prove Plaintiff's ability to work, substantial record evidence confirms that Plaintiff's physical impairments sufficiently improved by January 2020 to allow him to perform the sitting, standing, and travel requirements of his occupation.**

In initially applying for benefits in September 2014, Plaintiff asserted that due to back pain, he was unable to sit for more than "2–3 hours per day" and that this physical limitation interfered with his occupational duties of "desk work, frequent meetings, travel, and conferences." AR7505. In a supplemental statement, Plaintiff told USAble Life, "I am unable to alternate sitting and standing; lying down or reclining and resting are the only two positions to offer me relief." AR7475. Plaintiff's claimed limitations related only to the physical duties of his occupation, as described by Ms. Marques, in her May 19, 2015 Own Occupation Assessment. AR5306.

In October 2017, Dr. Russell, based on the medical evidence then available, opined that Plaintiff was limited from performing such duties and that his limitations might continue permanently. AR5959. But, with the benefit of two additional years' worth of medical evidence, Dr. Russell opined in October 2019 that the record no longer supported functional impairment from any of Plaintiff's occupational duties. AR4740. As summarized in Dr. Russell's report, the evidence by that time confirmed Plaintiff's dramatic 70-pound weight loss, his regular exercise program, his ability to take college-level courses, his volunteer

work on charitable boards, and his capacity to travel throughout the country, to Mexico, and even to Africa for a safari. *See*, *e.g*., AR4740–45.

Having reviewed the totality of medical evidence available, Dr. Russell's opinion—like the opinions of USAble Life's later reviewers during the appeal—constitutes at the very least "substantial evidence." His report is clearly more reliable than the conclusory opinions of Plaintiff's treating physicians, like Dr. Patel who did not respond to Dr. Russell's inquiries, *see*, *e.g*., AR3784, and who merely echoed Plaintiff's own self-assessment of disability without even attempting to reconcile such claims with the evidence of Plaintiff's actual lifestyle.

Here, the Social Security ALJ also denied Plaintiff's application for SSDI benefits after finding, in a detailed August 2018 ruling, that Plaintiff's self-reported limitations were inconsistent with the overwhelming evidence of his actual lifestyle, which included taking college classes, serving on charitable boards, performing ordinary household work, working out with a personal trainer, eating out in restaurants, and extensive domestic and international vacation travel. AR5474. The ALJ specifically found that Plaintiff "is capable of performing past relevant work." AR5478. As such, the SSA's determination further confirms that USAble Life's similar determination was correct, let alone reasonable, which is all that is required. *See*, *e.g*., <u>Bard v. Boston Shipping Ass'n</u>, 471 F.3d 229, 242 n.17 (1st Cir. 2006).

The record before USAble Life at the time of its initial determination also included surveillance of Plaintiff, for example, working out at a gym with his personal trainer in July 2019 and using a treadmill, weight machines, and free weights. AR4965. Such evidence again confirms Plaintiff's actual physical capacity was well in excess of his self-reported functional abilities. *Compare*, *e.g.*, AR4756 (Plaintiff's self-report that he can sit for no more than 1–2 hours or stand for more than 30 minutes). It was correct for USAble Life to credit such evidence. *See*, *e.g.*, Cusson v. Liberty Life Assurance Co., 592 F.3d 215, 229 (1st Cir. 2010); Tsoulas, 454 F.3d at 80.

In his December 12, 2019 determination letter, Mr. Emma detailed all of this evidence, considered it in light of the updated vocational assessment prepared by Ms. Marques, and properly applied the Group Policy's definition of disability to find that no further benefits were payable beyond January 1, 2020. AR3753–59.

**C.     USAble Life correctly rejected Plaintiff's attempt, on appeal, to shift the basis of his claim to newly-alleged cognitive symptoms because Plaintiff had previously denied such symptoms, and the medical evidence he belatedly offered did not support disability on such grounds at any time.**

Following its initial December 2, 2019 termination, USAble Life afforded Plaintiff a full and fair appeal of his claim, undertaken by personnel with no prior involvement in the claim. Prior to that appeal, the file contained no formal cognitive testing of any kind, and the mental status examinations performed by

Plaintiff's various treating physicians are uniformly unremarkable and repeatedly show "intact" judgment, memory, attention and concentration. *See* AR6139; AR6137; AR6135; AR5182; AR5208; AR5228. Even the materials Plaintiff initially submitted in on appeal—such as the February 2020 letters from Drs. Fujioka and White—emphasized Plaintiff's claimed physical limitations, and attempted to minimize the evidence of Plaintiff's actual activity levels, without mentioning any alleged cognitive impairment. *See* AR3065 ("[T]his letter is a clarification of [Plaintiff's] ability to exercise."); AR3062 ("These limitations make it nearly impossible for [Plaintiff] to stand or sit for any length of time.").

Upon Dr. Maguire's initial review of the medical evidence, he recommended an IME. AR2649. However, Plaintiff refused to appear, citing Covid concerns. *See*, *e.g*., AR2567.[15] Nevertheless, USAble Life, demonstrating good faith and its commitment to accurate claim determinations, allowed Plaintiff's multiple requests for additional time, reviewed his updated medical submissions, and solicited the views of yet another board-certified physician.

In a thorough initial report, Dr. Kaplan found the medical evidence did not support functional impairment from Plaintiff's occupational duties after January 1, 2020. *See*, *e.g*., AR2534. After discussing Plaintiff's physical limitations and

---

[15] This refusal alone would have been sufficient grounds for USAble Life to terminate benefits. *See* AR7541 (Group Policy requirement to appear for IME).

subjective pain symptoms at length, Dr. Kaplan also noted that the record contained "no mental status examination[s] or any other objective basis" sufficient to conclude "that there are any cognitive limitations related to the [Plaintiff's] medical condition or otherwise." AR2542. Dr. Maguire, upon his separate review of all updated medical evidence, fully concurred. *See*, *e.g*., AR2526; AR2436.

Through the end of 2020 and even into 2021, Plaintiff was still denying to his treating doctors that he was suffering any cognitive impairment as a result of his pain medications or otherwise. *See* AR563; AR560; AR557; AR554.

However, on March 19, 2021, following Plaintiff's receipt of Dr. Kaplan's December 23, 2020 report and Dr. Maguire's December 30, 2020 supplemental report—and nearly fifteen months after Plaintiff's coverage ended[16]—Plaintiff's counsel first notified USAble Life that Plaintiff was "in the process" of scheduling neuropsychological testing because he was allegedly suffering from "memory issues." *See* AR2440. On a review of the new materials sent, Dr. Maguire opined that "the reported memory issues are a new complaint occurring after January 2020." AR2437. And contrary to Plaintiff's new claim, Dr. Kaplan observed that such records showed that Plaintiff obtained "a normal score" when he took a Montreal Cognitive Assessment test on March 18, 2021. AR2160.

---

[16] Under the Group Policy, coverage ends once benefits are no longer payable and a claimant is no longer actively at work. *See*, *e.g*., AR7539.

Undaunted, and after further requests from Plaintiff and his counsel to hold open the review until he obtained cognitive testing, Plaintiff finally submitted Dr. Bekken's September 10, 2021 report in October 2021, some twenty-two months after USAble Life's initial termination of benefits. *See* AR715; AR716.

Dr. Bekken's opinion is not reliable for many reasons: First, her testing does not relate to the time period properly under review. *See*, *e.g*., <u>Ovist v. Unum Life Ins. Co.</u>, 14 F.4th 106, 121–22 (1st Cir. 2021); <u>Sobh v. Hartford Life & Accident Ins. Co.</u>, 658 Fed. App'x 459, 466 (11th Cir. 2016); <u>Nance v. Sun Life Assurance Co. of Canada</u>, 294 F.3d 1263, 1270–75 (10th Cir. 2002) (disability must begin before coverage ends). Next, her opinion conflicts with the actual objective scores obtained during the testing. *Compare*, *e.g*., AR718–20 (noting many "average," "high average," and "superior" scores). According to Dr. Spica, Dr. Bekken's test results themselves do not show a cognitive impairment, but rather confirm "performances well within normal limits across neurocognitive domains, including on tasks known to be sensitive to cerebral compromise." AR704; *see also*, *e.g*., PL528; PL483; PL298; PL137.

Dr. Bekken merely speculated there was a cognitive decline from some hypothetical past baseline on the basis of Plaintiff's largely "average" performance. *See*, *e.g*., AR722 ("Despite a very high estimated premorbid ability, only about 20% of scores fell at expected levels (Superior or better), and only

about 40% were High Average or better.").  As Dr. Kaplan also observed, even if

the scores had shown the existence of some cognitive deficit, such results would

not be a reliable indicator of Plaintiff's true cognitive capacity in light of Plaintiff's

then-ongoing marijuana use.  *See*, *e.g*., PL74.  Dr. Bekken's opinion also conflicts

with the extensive contemporaneous treatment and examination records which

confirm no reports of—indeed, Plaintiff's own denials of—cognitive impairment

during the relevant 2018–2020 time period.  *See*, *e.g*., AR5001–02; AR4982–84;

AR4905–06; AR4857–58; AR3770–72; AR557–58; AR554–55.  Dr. Bekken does

not even mention such treatment records.

　　Following receipt of Dr. Bekken's report, USAble Life duly engaged yet

another independent physician, Dr. Spica, a board-certified neuropsychologist, to

review Plaintiff's belatedly-submitted evidence.  As explained by Dr. Spica, the

test results showed that Plaintiff's cognitive ability was generally normal across a

wide variety of testing domains.  AR702–704.  As such, the test results did not

support any conclusion that Plaintiff was cognitively impaired.  Rather, Plaintiff's

advocate, Dr. Bekken, had simply "interpret[ed]" the Plaintiff's "average scores"

as representing impairment based on mere speculation that Plaintiff might have

been able to score higher at some prior point in his life.  AR703.

　　In the exchange of letters, emails, and addendum reports which followed,

Dr. Spica maintained that Plaintiff's average scores confirmed the absence of any

impairing cognitive defect.  *See* PL528; PL483; PL298; PL137.  Dr. Kaplan

offered that even if some impairment was shown, the testing could not have

reliably verified Plaintiff's maximum cognitive capacity in light of his

acknowledged marijuana and opioid use.  *See*, *e.g*., PL74.  For her part, Dr.

Bekken never responded directly to such criticisms.  Instead, she doubled-down,

rehashing arguments based on Plaintiff's own subjective self-report of his

symptoms and the medically irrelevant fact that Plaintiff's marijuana and opioid

use was legally prescribed.  *See*, *e.g*., PL492.

Following that exchange, it was entirely correct for USAble Life to credit

the well-reasoned opinions of Drs. Spica and Kaplan, over the conclusory and un-

supported opinions of Dr. Bekken, who simply assumed that Plaintiff's average

scores indicated a loss of cognitive ability.  And here, Dr. Bekken was not even a

"treating physician" in the true sense of that term.  Rather, she was simply an

advocate, likely sought at the behest of Plaintiff's attorney.  *See*, *e.g*., <u>Abromitis v.</u>

<u>Continental Casualty Co.</u>, 261 F. Supp. 2d 388, 391 (W.D.N.C. 2003) ("While

claimants generally lack the resources enjoyed by defending companies, they, to,

are frequently referred to physicians and consultants who benefit from referrals

from the plaintiffs' bar.").

To the extent Plaintiff relies on Ms. Tourtellott's FCE reports, those

reports—both of which also post-date the termination of benefits—are also

unreliable because Ms. Tourtellott's opinions are based on Plaintiff's subjective self-report of his limitations, and her assessment lacks validity measures appropriate to the physical limitations alleged. *See*, *e.g*., AR2649. In the absence of such measures, which are designed to ensure that claimants actually put forth their best efforts during testing, Courts have long recognized that such reports have little persuasive weight. *See*, *e.g*., Hocheiser v. Liberty Mutual Ins. Co., 2021 WL 672660 at *10 (D.N.J. Feb. 22, 2021), *aff'd*, 2023 WL 1267070 (3d Cir. Jan. 31, 2023) ("[U]nless the FCE contains robust validity testing, the claimant can influence the results based on the amount of effort he puts forth during the evaluation."); Dunham-Zemberi v. Lincoln Life Assurance Co., 629 F. Supp. 3d 1220, 1232–33 (S.D. Fla. 2022); Gorbacheva v. Abbott Labs. Ext. Disability Plan, 309 F. Supp. 3d 756, 771 (N.D. Cal. 2018), *aff'd*, 794 F. App'x 590 (9th Cir. 2019); Lake v. Hartford Life & Acc. Ins. Co., 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004), *aff'd*, 126 F. App'x 463 (11th Cir. 2004). Moreover, Ms. Tourtellott's opinions are refuted by the evidence of Plaintiff's observed and acknowledged activities during the relevant period, including household chores, weight training, and international travel—evidence she never considered, let alone attempted to reconcile.

Certainly, neither Ms. Tourtellott's nor Dr. Bekken's testing supports Plaintiff's claimed limitations as of January 1, 2020—the relevant date in question.

Prior to January 1, 2020, the file contains essentially no clinical evidence showing any cognitive deficit severe enough to impair Plaintiff's ability to work. And even if Dr. Bekken's September 2021 testing had supported a cognitive deficit, by the time of that testing, Plaintiff's coverage had long-since come to an end. As such, the alleged cognitive limitations, even if proven by her testing, do not support additional benefits. *See* AR7539; *see also*, *e.g*., Ovist, 14 F.4th at 121–22.

USAble Life ultimately considered all of Plaintiff's evidence no matter the timing of its submission. USAble Life even afforded Plaintiff an additional voluntary post-litigation review to ensure a full evaluation of absolutely every piece of evidence and argument Plaintiff and his attorney wanted to submit. As demonstrated, for example, by the extensive rounds of back-and-forth between Drs. Kaplan, Spica, and Bekken, Plaintiff cannot plausibly argue, on this record, that USAble Life failed to consider and meaningfully engage with all of the evidence and arguments presented.

### D. USAble Life properly considered all of Plaintiff's alleged impairments in light of the physical and non-physical requirements of his occupation.

Plaintiff asserts that USAble Life failed to adequately consider the intellectual demands of Plaintiff's marketing occupation and attempts to liken this case to McDonough, 783 F.3d at 374. *See*, *e.g*., Pl.'s Br. at 48–50. Plaintiff can make that comparison only by ignoring the actual content of the record.

From the start of the claim, USAble Life's vocational consultant, Ms. Marques, fully described both the physical and non-physical requirements of Plaintiff's occupation, relying on information from Synta, Plaintiff, and the Department of Labor. *See*, *e.g.*, AR5304–07; AR4703–06. The mere fact that Ms. Marques did not use the adjective "exquisite" to characterize the level of concentration and attention purportedly required (as did Plaintiff's retained consultant Mr. LaRaia) does not in any way render her vocational analysis—or any part of USAble Life's review—unreasonable. *Compare*, *e.g.*, Pl.'s Br. at 10 (quoting AR649). Indeed, Mr. LaRaia's report does not anywhere criticize Ms. Marques's analysis or even argue that her assessment of Plaintiff's occupational demands was in any way inaccurate or incomplete. *See* AR649–55.

Ms. Marques' analysis of Plaintiff's occupational requirements was reviewed and considered by all of the consulting physicians. *See*, *e.g.*, AR5949; AR2645; AR2535; AR702. Moreover, all of the consulting physicians incorporated discussion of Plaintiff's occupation in their reviews and considered whether, in light of the occupation's requirements, Plaintiff's claims of physical impairment—and later his claims of cognitive impairment—were actually supported by the medical records, surveillance, and other evidence in the record. They uniformly found, often after extensive back-and-forth with Plaintiff's

advocates, that overall the available evidence did not prove Plaintiff's claimed inability to work in his occupation.

In addition, all of the determination letters likewise confirm that USAble Life fully assessed Plaintiff's claimed limitations in light of his occupational duties. Mr. Emma's December 12, 2019 determination letter, for example, quoted the applicable Group Policy language concerning the standard for disability, discussed the occupation's physical requirements (which were all that were at issue at the time), and summarized the evidence and the procedural history of the claim before explaining the reasons for the determination. *See* AR3753–58.

Similarly, in her initial uphold letter, Ms. Kaserman specifically considered Plaintiff's claim—based on Dr. Bekken's belatedly-submitted neuropsychological examination—that his alleged cognitive limitations might preclude some occupational duty. AR432; *see also*, *e.g.*, AR702–04. Thereafter, she considered additional correspondence and arguments concerning Plaintiff's alleged cognitive impairments, including at least seventeen letters and addendum reports that Dr. Bekken, Dr. Spica, and Dr. Kaplan exchanged during the voluntary post-litigation review. *See*, *e.g.*, PL492–93; PL527–29; PL521–23; PL510–12; PL514–15; PL449–50; PL496–501; PL483–84; PL473–75; PL298–99; PL222–24; PL148–49; PL137–38; PL91–93; PL96–97; PL85; PL74–76.

At the conclusion of this exhaustive review, Ms. Kaserman wrote on February 28, 2023, to again uphold the determination. *See* PL12–24. Ms. Kaserman again correctly identified and quoted the Group Policy's definition of disability, summarized the evidence, and responded to the various arguments asserted by Plaintiff's counsel. *See* PL12–24. With respect to Plaintiff's non-physical occupational requirements, she said, in relevant part, that Plaintiff's "Senior Vice President job is specific to corporate development with clear tasks of identifying partners, negotiating, closing deals, developing relationships, leading press releases/company communications, product development and influencing outcomes." PL18. "These tasks were noted to be the most consistent with the Marketing Manager occupation, previously identified in [Ms. Marques's] own occupation assessment dated May 19, 2015." PL18–19. Such discussion confirms—particularly when viewed in light of Ms. Kaserman's lengthy discussion of the various opinions exchanged between Drs. Bekken, Spica, and Kaplan during the post-litigation review, *see*, *e.g*., PL21–23—that USAble Life fully evaluated Plaintiff's proffered evidence of cognitive impairment in light of his physical and cognitive occupational demands.

**E.** **The 2018 ERISA regulations are inapplicable because they post-date Plaintiff's claim, but even if they did apply here, USAble Life complied with them by fully explaining the basis of its decision.**

Throughout his Brief, Plaintiff argues that USAble failed to comply with the Department of Labor's 2018 amendments to the ERISA regulations—particularly the expanded explanation requirements reflected in 29 C.F.R. § 2560.503-1(j)(6), as amended. *See*, *e.g*., <u>Appellant's Br.</u> at 41–42, 47–48. Plaintiff also contends that, in light of these regulatory amendments, the District Court erred in relying on <u>Nord</u>, 538 U.S. at 822, for the proposition that USAble Life's explanation of its rationale was sufficient. *See*, *e.g*., <u>Appellant's Br.</u> at 47–48. Plaintiff is wrong on both counts.

As the regulations themselves makes clear, the portion of 29 C.F.R. § 2560.503-1(j)(6) that Plaintiff selectively quotes is only effective with respect to disability claims filed after April 1, 2018, and thus, that regulatory provision does not apply to Plaintiff's claim which commenced in 2014. *See* 29 C.F.R.

§ 2560.503-1(p)(3); *see also*, *e.g.*, 82 Fed. Reg. 56,560-1 (Nov. 29, 2017); 81 Fed.

Reg. 92,316-1 (Dec. 19, 2016).[17]

In any event, USAble Life's determination letters more than adequately

explain the reasons for USAble Life's decisions. ERISA's notice requirements are

designed to insure that a claimant "will be able to address the determinative issues

and have a fair chance to present his case." Niebauer v. Crane & Co., 783 F.3d

914, 927 (1st Cir. 2015) (internal quotation omitted). In assessing a notice based

challenge, the Court asks whether the claimant "was supplied with a statement of

reasons that, under the circumstances of the case, permitted a sufficiently clear

understanding of the administrator's position to permit effective review." *Id.*

(internal quotation omitted). USAble Life's determination letters easily meet that

standard.

Plaintiff asserts that the final determination letter, issued after the close of

USAble Life's voluntary post-litigation review, insufficiently addresses various

aspects of Plaintiff's claimed physical limitations, for instance by mentioning Dr.

---

[17] In the alternative, Plaintiff argues that even if the 2018 regulations were not applicable on their face, USAble Life nevertheless "adopted" each of the new regulatory requirements. *See* Appellant's Br. at 43, 50–52. Again, such contentions conflict with the record. The USAble Life internal guidance concerning the contents of determination letters, which Plaintiff quotes on pages 50 and 51 of his Brief, dates from after the effective date of the 2018 regulatory amendments and nowhere states that those amendments apply retroactively to claims, such as Plaintiff's, which predate the amendments. *See* AR37–40.

Patel only "three times." Appellant's Br. at 51. However, the content of that letter merely reflects the shifting nature of Plaintiff's claim. At the time of USAble Life's initial determination in December 2019, Plaintiff's claim was based on alleged physical impairments, and Mr. Emma addressed those alleged limitations at length. *See* AR3753–58. But by the time of USAble Life's final determination letter in February 2023, Plaintiff's former arguments with respect to alleged physical limitations had become untenable—especially given his extensive national and international travel and other evidence in the record—so Plaintiff narrowly focused his arguments instead on alleged cognitive impairments purportedly supported by Dr. Bekken's September 2021 testing. Thus, Ms. Kaserman, in her final uphold letter, appropriately spent more time discussing Dr. Bekken's opinions. *See* PL11–24.

Finally, the First Circuit requires a showing of prejudice to obtain a remand based on an alleged regulatory violation. *See*, *e.g*., Lavery v. Restoration Hardware LTD Benefits Plan, 937 F.3d 71, 82 (1st Cir. 2019); Niebauer, 783 F.3d at 927. Here, Plaintiff has not even attempted to make any such showing. The record is clear that USAble Life shared all of the relevant consultant reports and addendum reports with Plaintiff in a timely manner. Plaintiff and his counsel responded to each report with additional advocacy, prompting round-after-round of additional reports and responses. In light of such extensive back-and-forth, there is

no substantive issue in this case that was not exhaustively discussed and debated. Plaintiff was not prejudiced by any hypothetical failure to fully explain.

### F. Plaintiff cannot meet his burden to show "arbitrary and capricious" decision-making by picking at the evidence.

Much of Plaintiff's Brief is devoted to minimizing the extensive evidence that is contrary to his claim while trying to highlight other irrelevancies which do not bear on functional capacity. *See*, *e.g.*, <u>Appellant's Br.</u> at 52–53, 58–59, 62, 65–66. For instance, Plaintiff debates the cause of his dramatic weight loss—attributing it to dietary changes rather than to exercise—but asks this Court to overlook the effect losing 70 pounds would obviously have on one's tolerance for standing, walking, and performing other physical activities. *See* <u>Appellant's Br.</u> at 60. Plaintiff wants to this Court to credit Dr. Fujioka's *post-hoc* advocacy, even though it contradicts Dr. Fujioka's own contemporaneous progress notes which repeatedly document Plaintiff's regular exercise—including working with a personal trainer 3 days a week" and "playing pickle ball on his off days." *See* <u>Appellant's Br.</u> at 61; *compare*, *e.g.*, AR3065 *with* AR5208; AR5228; AR5277. Plaintiff asserts he needed to work with a personal trainer only to "avoid further injury," but refuses to acknowledge his trainer's (*i.e.*, his physical therapist's) contemporaneous documentation of continuous physical improvement. *See* <u>Appellant's Br.</u> at 60–61; *compare*, *e.g.*, AR4945; AR4942; AR4940; AR4935. Plaintiff mischaracterizes his own extensive national and international travel as

merely being "sporadic," and then claims that no adverse inference as to physical capacity might be drawn from such travel so long as he duly disclosed it to USAble Life. *See*, *e.g.*, Appellant's Br. at 59, 62–65. Plaintiff similarly seeks to minimize the evidence of his volunteer work on the irrelevant grounds that it too was timely disclosed. *See* Appellant's Br. at 65.

All of these arguments, and others, are variations on the theme that USAble Life should have weighed or balanced the extensive record evidence in some other way than it did. Such arguments do not demonstrate arbitrary and capricious decision-making, and the Court must resist Plaintiff's suggestion that it re-weigh or re-balance the record. That kind of second-guessing is erroneous under discretionary review. *See*, *e.g.*, Tsoulas, 454 F.3d at 77 ("[I]t is not for a court to determine precisely how much weight [an administrator] should have accorded [a particular piece of evidence] in its overall decision.") (internal quotation omitted); Leahy, 315 F.3d at 19 ("Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great.").

ERISA's discretionary standard of review "draws a line—or rather demarcates a region—between the unsupportable and merely mistaken, between the legal error, disorder of reason, severe lapse of judgment, and procedural failure that a reviewing court may always correct, and the simple disagreement that, on

this standard, it may not." <u>D&H Therapy Assocs., LLC v. Boston Mutual Life Ins. Co.</u>, 640 F.3d 27, 37 (1st Cir. 2011) (quoting <u>Evans v. Eaton Corp. LTD Plan</u>, 514 F.3d 315, 321–22 (4th Cir. 2008)).  As the Court in <u>Evans</u> said in admonishing a district court that erroneously re-weighed and re-balanced the evidence to overturn an administrator's discretionary decision:

> The purpose of standards of review is to focus reviewing courts upon their proper role when passing on the conduct of other decision-makers.  Standards of review are thus an elemental expression of judicial restraint, which, in their deferential varieties, safeguard the superior vantage points of those entrusted with primary decisional responsibility.
>
> * * *
>
> At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.

<u>Id.</u>, 514 F.3d at 320–22.  In <u>Evans</u>, unlike here, the record evidence of disability was closely balanced, and the Court held, that in applying the discretionary standard in such circumstances, "[t]he district court should have acknowledged the essential equipoise and stayed its hand."  <u>Id.</u> at 325.

**II.     The deferential "arbitrary and capricious" standard of review is not altered by an administrator's so-called structural conflict, and in any event, Plaintiff has made no showing that bias or conflict played any role in USAble Life's determination.**

Beginning on page 42 of his Brief, Plaintiff makes a convoluted argument that ill-defined "case-specific factors" somehow require either greater scrutiny or

less deference for USAble Life's final determination. Plaintiff's argument is directly at odds with <u>Glenn</u>, 554 U.S. at 105, and <u>Denmark</u>, 566 F.3d at 1, and in any event, as the District Court found, Plaintiff failed to make "any meaningful showing of [actual] bias." <u>Mem. & Order</u> at 15 (Add. 16).

As is well established, so-called "structural conflicts" do not alter the "arbitrary and capricious" standard of review or otherwise lessen the scope of discretionary authority that may be granted by the terms of an ERISA plan. *See* <u>Glenn</u>, 554 U.S. at 117. Rather, the existence of a structural conflict is treated merely as one factor among many—a factor which may act as a tiebreaker when other factors are "closely balanced," and even then, that factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy." <u>*Id.*</u>

Here, the record evidence is not closely balanced, and USAble Life's use of a different reviewer on the appeal, its payment of $405,000 under a reservation of rights while completing its review, its use of independent third-party vendors to select consulting physicians, and its allowance of a post-litigation review to ensure due consideration of all of the evidence and argument that Plaintiff and his lawyer wanted to submit (including materials first submitted more than two years after the initial termination of LTD benefits), as well as other procedural safeguards apparent in the record, demonstrate, as the District Court found, precisely the kind

of "active steps" that Courts recognize to reduce the risk of bias and promote accuracy.  *See*, *e.g*., <u>Ovist v. Unum Life Ins. Co.</u>, 2020 WL 1931755 at *8 (D. Mass. Feb. 21, 2020), *report and recom'n adopted*, 2020 WL 1931958 (D. Mass. Mar. 27, 2020), *aff'd*, 14 F.4th 106 (1st Cir. 2021); <u>Estrella v. Hartford Life & Accident Ins. Co.</u>, 2011 WL 4007679 at *4 (D. Mass. Sept. 6, 2011); *see also*, <u>Mem. & Order</u> at 15–16 (Add. 16–17).

USAble Life did not deny benefits due to Plaintiff's refusal to appear for an IME or even when it belatedly learned that Plaintiff had received treatment for his back condition during the applicable pre-ex look-back period.  Instead, it at all times sought to conduct a complete review on the merits of the claim.  In all respects, USAble Life did conduct itself here as a "true fiduciary attempting to fairly decide a claim, letting the chips fall as they may."  <u>Lavery</u>, 937 F.3d at 78.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment.

Respectfully Submitted,

/s/ Byrne J. Decker
Byrne J. Decker (1st Cir. #39350)
(byrne.decker@ogletree.com)
Scott K. Pomeroy (1st Cir. #85003)
(scott.pomeroy@ogletree.com)
Ogletree, Deakins, Nash, Smoak &
Stewart, P.C.
2 Monument Square, 7th Floor

Portland, ME 04101
(207) 387-2963

*Counsel for Defendant-Appellees*
*USAble Life; and Fullscope RMS,*
*f/k/a Disability RMS*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 12,998 words, excluding the parts of the brief exempted by Rule 32(f).  I further certify that this brief complies with the typeface and type-style requirements of Rule 32(a)(5) and (6).  This brief uses the Times New Roman font, a proportional typeface, printed in 14-point size.

/s/ Byrne J. Decker
Byrne J. Decker (1st Cir. #39350)

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January, 2025, I electronically filed the foregoing Brief for Defendants-Appellees USAble Life and Fullscope RMS, f/n/a Disability RMS with the United States Court of Appeals for the First Circuit by using the Court's CM/ECF system. I further certify that the following parties or their counsel of record are registered as CM/ECF Filers and that they will be electronically served by the CM/ECF system:

Mala M. Rafik, Esq.
ROSENFELD & RAFIK, P.C.
184 High Street, Suite 503
Boston, MA 02110
mmr@rosenfeld.com

/s/ Byrne J. Decker
Byrne J. Decker (1st Cir. #39350)

87012712.v6-OGLETREE